UNITED STATES of America,
Appellee,

v.

Judith MONZON, also known as
Miti, Defendant–Appellant.

Docket No. 00–1304.

United States Court of Appeals,
Second Circuit.

Submitted: Oct. 27, 2003.

Decided: Feb. 18, 2004.

James B. Comey, United States Attorney for the Southern District of New York, New York, New York (Daniel M. Gitner, Andrew J. Ceresney, Assistant United States Attorneys, New York, New York, of counsel), for Appellee.

Donna R. Newman, New York, New York, for Defendant–Appellant.

Before: FEINBERG, KEARSE, and RAGGI, Circuit Judges.

KEARSE, Circuit Judge.

Defendant Judith Monzon ("Monzon") appeals from a judgment entered in the United States District Court for the Southern District of New York following her plea of guilty before Denise Cote, *Judge*, convicting her of conspiracy to distribute and to possess with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. § 846, and sentencing her principally to 97 months' imprisonment. Monzon's plea was entered pursuant to an agreement in which she promised, *inter alia*, not to appeal her sentence if she received a prison term of 121 months or less. Monzon has appealed, contending that her appeal waiver is unenforceable and that she is entitled to be resentenced because she received ineffective assistance of counsel. Following the filing of Monzon's initial brief on appeal asserting these contentions, this Court granted a motion by the government for a remand to the district court to permit development of the record on the ineffective-assistance-of-counsel claim. *See United States v. Monzon*, No. 00–1304 (2d Cir. Jan. 9, 2001) ("*Monzon I*"). On remand, following an evidentiary hearing, the district court concluded that the claim was without merit. *See United States v. Monzon*, No. 99 CR. 157(DLC), 2001 WL 883647, at *15, *18 (S.D.N.Y.

Aug.6, 2001) (*"Monzon II "*). Monzon now renews her contentions that she received constitutionally ineffective assistance and that her waiver of the right to appeal is not enforceable. Finding no merit in any of her arguments, we conclude that the appeal should be dismissed.

## I. BACKGROUND

The present prosecution arose from an investigation of narcotics trafficking at First Avenue and 13th Street in Manhattan (the "Spot") which resulted in the indictment of Monzon, along with more than a dozen others, for conspiracy from October 1997 to January 26, 1999, to distribute cocaine and cocaine base ("crack"), in violation of 21 U.S.C. § 846. For purposes of the present case, the underlying events described below are no longer in dispute.

During the period of the conspiracy, Monzon's husband Oscar Monzon ("Oscar") was incarcerated in Florida, and Monzon resided in Florida. Prior to Oscar's incarceration, Oscar and Monzon lived in New York, and Oscar operated a drug distribution business at the Spot. Drugs were stored and packaged in their home; Monzon assisted with the packaging. After Oscar and Monzon moved to Florida, drugs were distributed at the Spot by codefendants Adria Rodriguez and Pedro Manuel Quezada, who paid "rent" on the Spot, collected by Monzon. Monzon was arrested following (a) the government's interception of telephone conversations between various members of the conspiracy, including several in which Monzon was mentioned and one in which she participated, (b) a consent search of Monzon's apartment yielding various incriminating items, and (c) postsearch incriminating statements by Monzon as to her knowledge of the provenance of the funds she received from Rodriguez and Quezada.

Monzon moved to suppress the evidence seized in connection with the search of her apartment, contending that she had not consented to the search and that she had made statements only after unsuccessfully requesting to speak with an attorney. An evidentiary hearing was held, at which Monzon and several law enforcement agents testified. The district court denied the motion, finding the testimony of the agents credible and that of Monzon not credible. (*See, e.g.,* Suppression Hearing Transcript, August 17, 1999, at 310–12; *id.* at 320 ("[I]n many parts of her testimony I felt [Monzon] was making it up as she went along . . . . She's also lied about a number of other things . . . .").)

Following the denial of her motion to suppress, Monzon entered into an agreement with the government pursuant to which she pleaded guilty ("Plea Agreement" or "Agreement").

### A. *The Plea Agreement, the Plea, and the Sentence*

In the Plea Agreement, the parties stipulated to various facts informing the calculation of Monzon's sentence under the Sentencing Guidelines ("Guidelines"). The Agreement provided, *inter alia,* that, based on her false testimony at the suppression hearing, Monzon's Guidelines offense level was to be increased by two steps for obstruction of justice and was not to be decreased for acceptance of responsibility. These and other agreed calculations resulted in a Guidelines-recommended imprisonment range of 97–121 months. However, because the minimum prison term prescribed by statute for the crack distribution conspiracy with which Monzon was charged was 10 years, *see* 21 U.S.C. § 841(b)(1)(A), the range applicable to her would have been 120–121 months, absent relief pursuant to the so-called "safety valve" provisions of 18 U.S.C.

§ 3553(f). The government agreed, *inter alia,* that since Monzon appeared to satisfy the conditions of § 3553(f), the government would recommend that she be sentenced within the range of 97–121 months without regard to the 120–month statutory minimum.

In the Agreement, Monzon agreed to plead guilty to the conspiracy charge. She also agreed, *inter alia,* not to appeal her sentence if the court imposed a prison term of 121 months or less:

> It is further agreed ... that the defendant will neither appeal, nor otherwise litigate under Title 28, United States Code, Section 2255, any sentence within or below the Stipulated Guidelines Range set forth above....

(Plea Agreement dated August 27, 1999, at 4.)

With Monzon's consent, her plea of guilty was entered before a magistrate judge. (*See* Plea Hearing Transcript ("Plea Tr."), August 27, 1999, at 2–3.) The plea colloquy between the magistrate judge and Monzon included the following:

> Q. Do you understand the nature of the charge to which you are entering a plea?
>
> A. Yes.
>
> Q. Do you understand the range of penalties to which you are potentially subjecting yourself by your plea of guilty?
>
> A. Yes.

(Plea Tr. 7.)

> Q. I notice that you have signed a plea agreement yourself.
>
> Before you signed it, did you discuss it with your attorney?
>
> A. Yes.
>
> Q. Did he explain to you all of the pertinent terms of the agreement and what they mean?

> A. Yes.
>
> Q. I note that as part of the plea agreement, there is a reference to what is called a stipulated guideline range which is described as 97 to 121 months.
>
> Do you understand that the district judge, when she sentences you, might choose, depending on the circumstances, to impose a term of imprisonment either less than this range or more than this range or somewhere within this range?
>
> A. Yes.
>
> Q. Do you also understand that if she imposes a sentence of no more than 121 months, as part of the plea agreement you are giving up your right to appeal from the sentence?
>
> A. Yes.

(Plea Tr. 8–9.)

In April 2000, Monzon was sentenced principally to a prison term of 97 months, to be followed by a five-year term of supervised release.

## B. *The First Stage of the Present Appeal*

Notwithstanding her agreement not to appeal her sentence if the court imposed a prison term of 121 months or less, Monzon appealed. Represented by new counsel, Monzon argued primarily that her prior attorney, Martin Schmukler, had rendered constitutionally ineffective assistance in his representation of her throughout the district court proceedings, including the negotiation of the Plea Agreement. (*See* Monzon October 2000 brief on appeal at 26.) She contended, *inter alia,* that Schmukler failed to conduct an adequate investigation before filing the motion to suppress (*see id.* at 31–35), failed to prevent her from testifying untruthfully at the suppression hearing (*see id.* at 33–35), and ineptly acted, or made omissions, in ways that cost her the opportunity to cooperate with the government and thereby obtain more fa-

vorable sentencing treatment (*see id.* at 26, 34–35).

Further, in an affidavit submitted to this Court, Monzon alleged that she had not fully understood the terms of the Plea Agreement (*see* Affidavit of Judith Monzon dated October 6, 2000 ("October 6, 2000 affidavit"), ¶ 19) and that Schmukler "did not fully explain the prohibition against appealing the court's sentence" (*id.* ¶ 18). She also alleged that Oscar's family had promised to, and did, pay Schmukler's fee for representing Monzon and that the family insisted to Monzon and Schmukler that Monzon take no action that would incriminate Oscar, the implication of these allegations being that Schmukler was to protect Oscar and hence had a conflict of interest that impaired his representation of Monzon. (*See id.* ¶¶ 6, 7, 24.)

Monzon contended that, "since her appeal is based on a claim of ineffective assistance of counsel, her [appeal] waiver is not enforceable." (Monzon October 2000 brief on appeal at 26.) She urged that her arguments be accepted despite the fact that at least part of the basis for her ineffective-assistance-of-counsel claim consisted of matters outside the record.

The government moved for dismissal of the appeal or, alternatively, for a remand to the district court for development of the record and findings of fact with respect to Monzon's ineffective-assistance-of-counsel claim. In *Monzon I*, a panel of this Court granted the motion to remand.

## C. The District Court's Decision on Remand

On remand, the district court conducted a three-day hearing, receiving documentary evidence and the testimony of several witnesses, including Monzon, Schmukler, Schmukler's paralegal assistant, and Oscar's brother and sister. In a thorough opinion following that hearing, the district court made detailed findings of fact and concluded that Monzon's claims that Schmukler had operated under a conflict of interest, that his performance was constitutionally deficient, and that Monzon had not understood that she agreed not to appeal a sentence if a prison term of 121 months or less was imposed, were all without merit. *See Monzon II*, 2001 WL 883647, at *11, *15, *18.

The court noted that Schmukler was an experienced criminal lawyer, having been an attorney for more than 30 years and having been an Assistant District Attorney for three of those years. The court stated that Schmukler had never been found by any court to have rendered ineffective assistance. *See id.* at *4. In general, the court found Schmukler's testimony as to his dealings with Monzon and others to be credible; it found contrary versions given by Monzon and members of Oscar's family not credible.

In particular, the court rejected the factual premises of Monzon's contention that Schmukler had a conflict of interest because Oscar's family was paying Schmukler's fee for representing Monzon and was exerting pressure to avoid Monzon's cooperating with the government and thereby implicating Oscar. The court found that "Counsel never sought to collect money from Oscar's or Monzon's family, and never attempted to contact Oscar's family for money or any other reason," *Monzon II*, 2001 WL 883647, at *5; that "Counsel was never told and never understood that any of the money that he received came from Oscar's family," *id.*; and that "Counsel never directly received money from Oscar's family," *id.* at *18. The court found that "if some of the money that he received from Monzon or [her brother] did come from Oscar's family, he was unaware of that fact." *Id.* In addition, the court found that if Oscar's family did contribute

toward Schmukler's fee it was "because they were worried about Monzon's well-being and the well-being of Monzon's and Oscar's children, and not because they wanted to prevent Monzon from cooperating against Oscar." *Id.* at *5. The court concluded that Schmukler "had no allegiance to anyone but Monzon," that he "had no motive to act in any way contrary to Monzon's best interests," and that he "provided Monzon with conflict-free representation." *Id.* at *18.

Further, the court found no reason to fault Schmukler's performance. With respect to Monzon's criticism of his making a motion to suppress the evidence collected in connection with the search of Monzon's apartment, the court found that the motion was made because Monzon repeatedly lied to Schmukler about the events on the night of the search and about her involvement in the narcotics conspiracy, and Schmukler believed her story. *See, e.g., Monzon II*, 2001 WL 883647, at *4–*5, *7. The court found that Monzon had maintained her innocence "[d]espite repeated questioning by Counsel, prior to the suppression hearing," *id.* at *16; that "Monzon never gave him any reason prior to the hearing to doubt" her veracity, *id.* at *8 n. 12; and that Schmukler had reviewed the discovery materials he received from the government and "nothing in the discovery materials in his possession before the hearing established that she was lying to him," *id.* at *16. Schmukler had

> informed Monzon of ... the possible disadvantages that she would suffer were the motion to be unsuccessful. Monzon was additionally aware of the importance of providing truthful testimony at the hearing, and was specifically informed by Counsel that there would be negative repercussions at sentencing if the court concluded that Monzon had provided untruthful testimony.

*Id.* at *8. Further, Schmukler had drafted an affidavit for Monzon, using the statements she made to him, and he had asked Monzon to inform him if anything in it was inaccurate. Monzon reviewed the affidavit, signed it, and returned it without suggesting that anything in it was untruthful. *See id.* At least by the time of the remand, however, "Monzon admit[ted] that she lied to Counsel regarding her involvement in the drug conspiracy and the circumstances of her arrest, and continued to lie in her affidavit submitted in support of her motion to suppress and at her suppression hearing." *Id.* at *18; *see also id.* at *9 ("Monzon admits that she gave untruthful testimony at the suppression hearing.").

The court concluded that "Counsel's decision to file the motion to suppress was entirely reasonable considering Monzon's repeated assertions to Counsel," *id.* at *17, and that Schmukler had believed Monzon's statements to him, "but that [that] cannot be attributed to ineffective assistance," *id.* at *16.

The district court also rejected Monzon's assertion that she had not been adequately informed of the terms of her Plea Agreement. The court noted that at the hearing on remand, "Monzon acknowledged that she had understood at the time that she pled guilty that, under the terms of the Plea Agreement, she could not appeal a sentence below 121 months." *Id.* at *11 n. 16. The court found that when Monzon stated during her plea allocution that she understood she was giving up that right, she was allocuting truthfully:

> Everything that Monzon said during her plea was true, Monzon understood everything that was asked of her, and Monzon understood that she ... was waiving her right to appeal any sentence of 121 months or less.

*Monzon II*, 2001 WL 883647, at *11. *See also id.* at *9 ("Monzon understood that,

under the terms of the Plea Agreement, Monzon would receive a term of imprisonment of between 97 and 121 months[ and] that she was waiving her right to appeal or attack a sentence within that range ....").

As to Monzon's contention that' ineptitude on the part of Schmukler cost her a chance to cooperate with the government and thereby gain a recommendation for a shorter sentence, the court concluded that any lost opportunity was the fault of Monzon, not Schmukler. The court found that "Counsel would periodically raise the issue of cooperation with Monzon. At no time prior to the suppression hearing did Monzon express any willingness even to explore the issue." *Id.* at \*5. Monzon did not evince any interest in cooperating until around the time of the safety valve proffer in connection with the negotiation of her Plea Agreement. *See id.* at \*10. The court concluded that "Monzon has established no more than that her own allegiances to Oscar and Oscar's family affected the decisions that she made regarding her defense." *Id.* at \*18.

In addition, the court noted that Schmukler had saved Monzon from losing all hope of a safety-valve reduction below the mandatory minimum 10–year prison term prescribed by statute when,' during her proffer session with the government, she initially lied about her participation in the conspiracy and he intervened to convince her to tell the truth. *See Monzon II,* 2001 WL 883647, at \*10. Moreover, the court found that Schmukler had gone to extraordinary lengths to attempt to have the court grant Monzon a downward departure from the Guidelines range of 97–121 months despite the provision in the Plea Agreement in which Monzon had promised not to seek such a departure. *See id.* at \*13–\*15.

In all, the court concluded that Schmukler's representation of Monzon "was not unreasonably deficient or even deficient." *Monzon II,* 2001 WL 883647, at \*15. "Defendant has demonstrated no lapse in Counsel's representation." *Id.* at \*18.

## II. DISCUSSION

Following the district court's decision on remand in *Monzon II,* Monzon filed a supplemental brief on appeal, renewing her contentions that she is entitled to be resentenced because she received ineffective assistance of counsel and because she did not understand that she was waiving her right to appeal. Finding no basis in the record, even as augmented, for either her ineffective-assistance-of-counsel claim or the claimed lack of understanding of her appeal waiver, we conclude that Monzon's appeal waiver is enforceable and that the appeal should therefore be dismissed.

### A. *Enforceability of Appeal Waivers*

■ "[W]aivers of the right to appeal a sentence, like waivers of constitutional rights, are invalid unless they are voluntary and knowing." *United States v. Ready,* 82 F.3d 551, 556 (2d Cir.1996) (*"Ready"*). Thus, a defendant's promise in a plea agreement to forgo the right to appeal a sentence is not enforceable unless "the record 'clearly demonstrates' that the waiver was both knowing (in the sense that the defendant fully understood the potential consequences of his waiver) and voluntary." *Id.* at 557; *see, e.g., id.* at 557–58 (declining to enforce waiver that was not knowing and voluntary); *United States v. Chen,* 127 F.3d 286, 289–90 (2d Cir.1997) (same).

Where the record clearly demonstrates that the defendant's waiver of her right to appeal a sentence within an agreed Guidelines range was knowing and voluntary, that waiver is enforceable. *See, e.g., United States v. Salcido–Contreras,* 990 F.2d 51, 51–52 (2d Cir.1993) (per curiam); *Unit-*

*ed States v. Rivera,* 971 F.2d 876, 896 (2d Cir.1992). "In no circumstance . . . may a defendant, who has secured the benefits of a plea agreement and knowingly and voluntarily waived the right to appeal . . . then appeal the merits of a sentence conforming to the agreement," for to permit such a defendant to escape the fairly bargained-for consequences of her agreement with the government would "render the plea bargaining process and the resulting agreement meaningless." *United States v. Salcido–Contreras,* 990 F.2d at 53.

■ Monzon attempts to liken her circumstances to those of the defendant in *Ready,* in which we found that the promise not to appeal had not been knowing. Monzon describes *Ready* as a case in which

> the minutes of the Rule 11 hearing revealed that *Ready's lawyer had advised him that he retained the right to appeal* a sentence which was illegally imposed. . . . As in *Ready,* [Monzon] understood if something illegal occurred she would be able to obtain relief.

(Monzon February 2003 brief on appeal at 24 (emphasis added).) However, this description bears little resemblance to the facts of *Ready;* and *Ready's* facts bear no resemblance to the record of the plea allocution of Monzon. To begin with, contrary to Monzon's description, the defendant's attorney in *Ready* in fact " 'ha[d] advised [Ready] that . . . pursuant to the plea agreement in Maryland, *he gives up his right to appeal* any sentence that might be rendered here pursuant to that agreement.' " 82 F.3d at 554 (quoting Ready's attorney's statement at plea hearing) (emphasis and brackets ours). More importantly, the district judge himself, in conducting Ready's plea allocution, "did not include the right to appeal in its list of the rights waived by Ready," *id.,* and indeed affirmatively advised Ready that " *'You have the right to appeal this sentence* to

[sic ] certain limited circumstances,' " *id.* (quoting district judge). And when defense counsel reiterated that he had advised Ready that Ready had no right to appeal, the court disputed that advice, stating, " 'if I impose an illegal sentence on him, he certainly would have the right to appeal that.' " *Id.* (quoting district judge). In light of this plea colloquy, we concluded in *Ready* that the record did not indicate that Ready's plea was knowing: "Since the court stated that the waiver only applied to legally imposed sentences, it would have been entirely reasonable for Ready to believe (with the judge) that he was not waiving his right to appeal a sentence that was imposed illegally." *Id.* at 557.

In the present case, in contrast, there was no statement by the magistrate judge at Monzon's plea hearing to suggest that Monzon had any right of appeal. As set out in Part I.A. above, the magistrate judge, after questioning Monzon as to her understanding of the range of penalties to which she was subject, asked, "Do you also understand that if [the district judge] imposes a sentence of no more than 121 months, as part of the plea agreement you are giving up your right to appeal from the sentence?" (Plea Tr. 9.) Monzon responded, "Yes." *(Id.)*

Nor did Monzon suggest in her plea allocution—or indeed in her testimony on remand—that Schmukler or anyone else had intimated to her that she would have any right of appeal if the court sentenced her to a prison term of 121 months or less. Although Monzon conclusorily claimed at the hearing on remand that she believed she could appeal if something was "wrong" (Transcript of Hearing on Remand, July 12, 2001, at 406), she testified in response to questioning by the government as follows:

> Q. . . . [A]t the time that you pled guilty, at the time that you signed your

agreement, you knew that if the Judge sentenced you to anything below 121 months, you could not appeal, isn't that right?

A. Yes, I think I recall something like that. I am not sure.

Q. It's not just that you think you recall, as you sit here today, *you knew that at the time you pled guilty, you understood that was the case, isn't that right?*

A. *That I could not appeal my sentence?*

Q. *If it was below 121 months.*

A. *Yes.*

(*Id.* at 405 (emphasis added); *see also id.* at 409–10 (at her plea hearing, Monzon understood "every question [she] answered," and in answering, she "w[as] telling the truth").)

In sum, there is nothing in the transcript of Monzon's plea allocution to support her contention that she did not understand her Plea Agreement commitment to give up the right to appeal her sentence if the prison term imposed was 121 months or less. And Monzon's testimony at the hearing on remand, as quoted above, confirms that she understood that she was giving up that right. The district court found that at the plea hearing, when Monzon stated that she "understood that she ... was waiving her right to appeal any sentence of 121 months or less," she spoke truthfully. *Monzon II,* 2001 WL 883647, at *11. We conclude that this finding is amply supported by the record.

B. *The Interplay Between Enforceability of an Appeal Waiver and a Claim of Ineffective Assistance Of Counsel*

■ Monzon contends that we should nonetheless find her appeal waiver unenforceable because she was denied effective assistance of counsel. She relies on *United States v. Hernandez,* 242 F.3d 110, .113 (2d Cir.2001) (per curiam) ("*Hernandez* "), for the proposition that "a waiver in a plea agreement of appellate rights will not be enforced where the defendant *claims* that the plea agreement was entered into without effective assistance of counsel." (Monzon February 2003 brief on appeal at 22 (emphasis added).) We have two difficulties with this proposition.

First, *Hernandez* is inapposite. There, the defendant who claimed that his agreement to plead guilty was the result of ineffective assistance of counsel—because counsel had misled him as to the consequences of his plea—had moved to withdraw his plea; on appeal, he challenged the court's denial of that motion. We noted that in his plea agreement, Hernandez had agreed not to appeal " '*any sentence* within or below the stipulated Guidelines range.' " 242 F.3d at 113 (quoting plea agreement) (emphasis in *Hernandez* ). Although we ruled that Hernandez was entitled to pursue on appeal his constitutional challenge to the court's refusal to allow him to withdraw his plea, *see id.* at 113–14, we stated that "had Hernandez raised any issues about his sentence, we would have refused to consider them," *id.* at 114.

Here, Monzon challenges only her sentence and does not seek to withdraw her plea of guilty. (Indeed, she has indicated that if counsel had performed as she now contends he should have, she would have pleaded guilty sooner (*see* October 6, 2000 affidavit ¶ 27).) Accordingly, *Hernandez* provides no support for her claim that her appeal waiver is unenforceable.

Second, we reject the notion that an appeal waiver becomes unenforceable simply because a defendant "claims" (Monzon February 2003 brief on appeal at 22) ineffective assistance of counsel. The appeal waiver would be unenforceable if the record of the criminal proceeding revealed

that the claim that the waiver was the result of ineffective assistance of counsel was meritorious. But if the record on appeal shows that that claim lacks merit, the appeal should be dismissed because the waiver should be enforced. Similarly, if the merits of the ineffective-assistance-of-counsel claim cannot be determined on the basis of the record on appeal, it is appropriate to enforce the appeal waiver and dismiss the appeal. If the rule were otherwise, a defendant who secured the benefits of a plea agreement by, *inter alia*, knowingly and voluntarily waiving the right to appeal could escape the fairly bargained-for appeal waiver by the simple expedient of asserting an ineffective-assistance-of-counsel claim that had no merit. To find an appeal waiver unenforceable simply because the defendant makes the claim, where the record (a) indicates that the appeal waiver was knowing and voluntary and (b) does not show merit in the ineffective-assistance-of-counsel claim, would "render the plea bargaining process and the resulting agreement meaningless," *United States v. Salcido–Contreras*, 990 F.2d at 53.

In the present case, the panel in *Monzon I* granted the government's motion to remand to the district court for supplementation of the record as to the ineffective-assistance-of-counsel claim. We express no view as to whether remanding, rather than leaving the defendant to attempt a collateral challenge pursuant to 28 U.S.C. § 2255, is appropriate in the absence of a motion by the government. *Cf. Massaro v. United States*, 538 U.S. 500, 123 S.Ct. 1690, 1694, 155 L.Ed.2d 714 (2003) ("[I]n most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective-assistance."). In light of the remand, we proceed to a review of whether the augmented record supports Monzon's claims that her appeal waiver was unenforceable because she received ineffective assistance of counsel or because it was unknowing.

## C. The Merits of Monzon's Ineffective–Assistance–of–Counsel Claim

■ In order to prevail on a claim of ineffective assistance of counsel, a defendant must establish both (1) that "counsel's representation fell below an objective standard of reasonableness .... under prevailing professional norms," *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052. Whether an attorney's representation of a defendant violated the Sixth Amendment right to effective assistance of counsel is a mixed question of law and fact. *See, e.g., United States v. Schwarz*, 283 F.3d 76, 90–91 (2d Cir.2002). Where the district court has decided such a claim and has made findings of historical fact, those findings may not properly be overturned unless they are clearly erroneous. *See, e.g., United States v. Gordon*, 156 F.3d 376, 379 (2d Cir.1998) (per curiam). The district court's conclusions of law are reviewed *de novo. See, e.g., id.*

■ In reviewing factual findings, "[w]e owe particularly strong deference where the district court premises its findings on credibility determinations." *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 64 (2d Cir.1992). "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S.Ct.

1504, 84 L.Ed.2d 518 (1985). Further, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574, 105 S.Ct. 1504; *see United States v. Yellow Cab Co.,* 338 U.S. 338, 342, 70 S.Ct. 177, 94 L.Ed. 150 (1949).

■ In the present case, the district court on remand set out the legal framework for assessing Monzon's ineffective-assistance-of-counsel claim. We see no error in the court's statement of the legal principles, and Monzon makes no claim that there was an error of law.

Instead, without acknowledging the deference to which the court's credibility assessments are entitled, Monzon argues that different factual findings should have been made, relying largely on her own testimony and that of Oscar's family members as to what Schmukler was told about the payment of his fee, on Monzon's testimony as to her conversations with Schmukler with regard to her defense, and on her conclusory statements as to her belief in her right to appeal. We see no basis for overturning the court's findings.

The district court, in assessing the first prong of the *Strickland* test, *i.e.,* whether Schmukler's performance was below professional norms, made detailed findings of fact as described in Part I.C. above as to, *inter alia,* the conversations between Monzon and Schmukler and the tasks performed by Schmukler in representing Monzon. The court found that Schmukler had reviewed all of the discovery materials provided to him by the government; that he had ably represented Monzon at sentencing; that he had skillfully intervened in the proffer conference when Monzon began to lie and thereby jeopardize her chances for gaining a safety-valve recommendation that could reduce her prospective prison time by nearly two years; that Schmukler had explained to Monzon, *inter alia,* the sentencing danger in making a

suppression motion if the court viewed her suppression hearing testimony as false; that he had repeatedly questioned Monzon prior to the suppression hearing; and that Monzon had repeatedly lied to Schmukler about the events on the evening of the search and about her involvement in the drug conspiracy. These findings were based principally on the court's credibility assessments of the witnesses. Our review of the record provides no basis for concluding that the court's findings are erroneous, much less "clearly" erroneous.

■ Monzon relies heavily on a statement by Schmukler at the sentencing hearing to the effect that he wished he had not made the suppression motion. (*See* Sentencing Hearing Transcript, April 14, 2000, at 17 ("I am very sorry that I ever made a motion to suppress in this case. I am very sorry that I put my client on the witness stand.").) We have no doubt that his regret was genuine, given that he had mistakenly believed what his client told him. But counsel's strategic choices are not to be judged by hindsight. *See, e.g., Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. 2052. We agree with the district court's conclusion that Schmukler's belief in Monzon's lies did not constitute constitutionally ineffective assistance and that Schmukler's performance was not below prevailing professional standards.

Finally, although a defendant's right to the effective assistance of counsel also includes the right to be represented by an attorney who is free from conflicts of interest, *see, e.g., Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981); *Holloway v. Arkansas,* 435 U.S. 475, 481–84, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *United States v. Perez,* 325 F.3d 115, 125 (2d Cir.2003); *Armienti v. United States,* 234 F.3d 820, 823 (2d Cir.2000), the findings of the district court here with respect to what Schmukler knew as to the source of his fee for representing Monzon

require the rejection of Monzon's conflict-of-interest claim as untenable. In assessing this claim, the court made findings as to the dealings between Schmukler and members of Oscar's family and found that the testimony of Monzon and Oscar's siblings, who claimed that Schmukler knew that his fee for representing Monzon was to be paid by Oscar's family, should not be credited.

For example, Monzon and Oscar's sister Francia testified that the family's promise to pay was made during Monzon's first interview and strategic conference with Schmukler, which they claimed Francia had attended in its entirety. Schmukler, however, testified that there was no such payment arrangement with him and that he had met with Monzon privately; he stated that he would not have allowed Francia to attend the conference because to do so would have invalidated a claim of attorney-client privilege. The court found Schmukler's testimony more credible and reasonably found it more plausible in light of the normal professional concerns for confidentiality.

The court credited Schmukler's testimony that if any of his fee was paid by members of Oscar's family, it was without his knowledge, finding that "[Schmukler] never directly received money from Oscar's family, and if some of the money that he received from Monzon or [her brother] did come from Oscar's family, he was unaware of that fact." *Monzon II*, 2001 WL 883647, at *18. As to the contrary testimony by Oscar's brother Ramon, the court noted as follows:

> Ramon, who contends that he collected the money donated by Oscar's family, could not make even a ballpark estimate of the amount of money he personally contributed, or the amount of money he collected from other members of his family to contribute to Monzon's defense. Ramon could not remember the amount of times that he gave money to [Monzon's brother] for Counsel, or the amount of money that he gave to [Monzon's brother] at any given time.

*Id.* at *5 n. 10. Our review of the record provides no basis for overturning the district court's findings that Schmukler had no allegiance to anyone but Monzon. We conclude that the court properly ruled that he had no interest that conflicted with his representation of Monzon.

## CONCLUSION

We have considered all of Monzon's arguments in support of appealability and have found them to be without merit. Given that Monzon agreed to waive any right to appeal a sentence in the range within which she was in fact thereafter sentenced, and that the record, even as augmented on remand, does not support the contention that that agreement was unknowing, involuntary, or the product of ineffective assistance of counsel, we conclude that the right to appeal has been waived.

Monzon's appeal waiver is enforceable, and we therefore dismiss the appeal.